USM Corporation *vs.* First State Insurance Company
& another.[1]

No. 93-P-748.

Suffolk. April 14, 1994. - October 14, 1994.

Present: Armstrong, Dreben, & Jacobs, JJ.

Further appellate review granted, 419 Mass. 1102 (1994).

*Insurance,* "Consultants errors and omissions" policy, Construction of pol-
icy, Coverage, Notice. *Contract,* Insurance. *Uniform Commercial
Code,* Sale of goods. *Words,* "Errors and omissions."

The furnishing under a contract of a "turnkey" computer system that in-
cluded selection of the hardware and development of the software was
an activity described and covered under the language of a "consultants
errors & omissions" liability insurance policy, and coverage was not
precluded by the fact that part of the products supplied were "goods"
and not services. [473-474]

The language of a "consultants errors & omissions" liability insurance
policy, insuring against loss "by reason of any negligent act, error or
omission," covered not only negligent acts, but also errors or omissions
that amounted to a breach of warranty in the furnishing of consulting
services. [474-476]

The term "tangible" appearing in an insurance policy exclusion that pre-
cluded coverage for consultants' errors and omissions in the design of
any "tangible" products was, at least, ambiguous as applied to a turn-
key computer system consisting of hardware and software, and the ex-
clusion was inapplicable to such a system. [477-479]

An exclusion under a "consultants errors & omissions" policy of liability
insurance "for liability assumed by the insured under any contract" did
not refer to the liability resulting from a breach of contract. [479]

In a civil action, materials submitted in support of cross motions for sum-
mary judgment raised a genuine issue of material fact whether notice
of a claim was properly given to insurers and whether in the circum-
stances the insurers waived that defense: the matter was remanded for
a determination of those issues. [479-480]

Where defendants in a civil action did not raise any issue as to damages
before the judge's ruling on cross motions for summary judgment, and
where they had full opportunity to participate in the determination of
damages, this court declined to exercise its discretion to consider the
issue on the defendants' appeal from the denial of their postjudgment
motions. [480-481]

---

[1]Granite State Insurance Company.

CIVIL ACTION commenced in the Superior Court Department on August 16, 1991.

The case was heard by *John C. Cratsley,* J., on motions for summary judgment.

*Louis N. Massery* for First State Insurance Company.

*Anil Madan* for Granite State Insurance Company.

*Jack R. Pirozzolo* for the plaintiff.

DREBEN, J. In *USM Corp.* v. *Arthur D. Little Sys., Inc.,* 28 Mass. App. Ct. 108 (1989) (the underlying case), we held Arthur D. Little Systems, Inc. (ADLS), in breach of a contract to furnish a "turnkey" computer system and remanded the matter for a determination of the damages due USM Corporation (USM). After our decision, ADLS filed a petition in bankruptcy. The bankruptcy court relieved USM from the automatic stay provision of 11 U.S.C. § 362 (1988), and, after hearing, a judge of the Superior Court entered judgment against ADLS in the amount of $1,833,695, which, with interest, totalled $4,235,224.17. No portion of that judgment has been paid.

In this action USM seeks to reach and apply "Consultants Errors & Omissions" policies issued to Arthur D. Little, Inc. (ADL), which also covered its subsidiary, ADLS, in order to obtain satisfaction of the judgment. A judge of the Superior Court denied the insurers' joint motion for summary judgment and allowed the plaintiff's, ruling that there was coverage under the policies and ordering the insurers to pay the unsatisfied judgment in the proportions set forth in the policies.[2] The judge also denied the insurers' postjudgment motions for reconsideration.

The insurers have appealed, and we are faced with construing the "Consultants Errors & Omissions" policies. The insurers claim that the policies do not provide coverage for the breach of contract found in the underlying case, that USM's claim in this action is inconsistent with its position in

---

[2]First State Insurance Company (First State) issued the basic policy. There were also two additional "excess" policies which were issued subject to the same terms and conditions. First State covered eighty percent of the excess and Granite State Insurance Company covered twenty percent.

the prior action, that two exclusions from coverage apply, and that there are issues of fact relating to notice and damages which preclude the grant of summary judgment. We affirm the judgment in so far as it declares that the policies cover the conduct of ADLS which gave rise to the liability to USM, but remand for a determination whether ADLS complied with the notice provisions of the policies.

1. The interpretation of an insurance contract is a question of law. *Cody* v. *Connecticut Gen. Life Ins. Co.*, 387 Mass. 142, 146 (1982). *Jefferson Ins. Co.* v. *Holyoke*, 23 Mass. App. Ct. 472, 475 (1987). We look first at the relevant coverage provisions of the policies before examining the exclusions. The insurers agreed "to indemnify" the insured against:

> "A. Loss incurred by the Insured from any claim made against the Insured during the Policy Period [April 1, 1979 - April 1, 1980] by reason of any negligent act, error or omission committed during the Policy Period anywhere in the world, by the Insured in the conduct of its business as consultants, and in the rendering of professional services incidental thereto."[3]

Emphasizing that the policy insures against errors in consulting and that the contract between USM and ADLS was for the sale of goods and not consulting services, the insurers point to the language of our previous opinion: "As the products to be supplied were 'goods' and their sale constituted a significant part of the agreement, the services being incidental, [the contract is subject to the provisions of Article Two of the Uniform Commercial Code (UCC)]." 28 Mass. App. Ct. at 119. That the contract was for "goods" for purposes of

---

[3]The policies also covered:

"B. Loss incurred by the Insured from any claim made against the Insured during the Policy Period, by reason of any such negligent act, error or omission committed prior to the Policy Period, provided the Insured at the effective date of this Policy, had no knowledge or could not have reasonably foreseen that such negligent acts, errors or omissions could be the basis of a claim or suit."

the UCC, however, does not preclude coverage under the policies nor indicate an inconsistency with the previous position taken by USM. The ADLS-USM contract was a hybrid one.[4] Not only did the contract price reflect that a substantial portion, although not the predominant part of the contract, was for professional services, such as consulting and developing software ($159,246 out of a total price of $333,913.20), see 28 Mass. App. Ct. 115 n.7, but, equally important, while ADLS was ultimately to transfer the hardware to USM, it was also to select the hardware, develop the applications software, and integrate the two to work in combination to perform the required task within a reasonable response time. *Id.* at 119.

These functions of ADLS are activities "in the conduct of its business as consultants, and in the rendering of professional services incidental thereto," as described in the "Consultants Errors & Omissions" policy. A consultant is "one who gives professional advice or services regarding matters in the field of his special knowledge or training." Webster's Third New Intl. Dictionary 490 (1971).

2. In the underlying case, ADLS was held liable because, in addition to warranting that the system would be in substantial accord with certain functional specifications, it warranted that "at the time of delivery the system will be free of defects in design." 28 Mass. App. Ct. at 119. We adopted the "ordinary sense" of the word "design" to "include the

---

[4]The general tendency has been to view such mixed contracts of hardware and software as governed by the UCC. *Cambridge Plating Co.* v. *Napco, Inc.*, 991 F.2d 21, 24 (1st Cir. 1993). Because of the trend in this direction, a number of articles have criticized a test for computer systems that bases coverage under the UCC on whether goods or services "predominate," pointing to the definition in art. 2, § 2-105(1), which states that " 'Goods' mean all things (including specially manufactured goods) which are moveable at the time of identification to the contract of sale." See, e.g., Holmes, Application of Article Two of the Uniform Commercial Code to Computer System Acquisitions, 9 Rutgers Computer & Tech. L.J. 1, 14-15, 25 (1982). Cf. Note, Computer Programs as Goods Under the U.C.C., 77 Mich. L. Rev. 1149, 1164-1165 (1979). Similarly, as will be discussed, *infra* at 477-479, in considering exclusion (e) of the policy, the authorities suggest that whether software is tangible or intangible should also not be the criterion to determine whether the UCC applies.

choice of hardware and software to work in combination with each other to do a particular job," and held that "the inability of those products, in combination, to perform the required tasks within a reasonable response time . . . constitute[d] a defect" in design. *Ibid.*

The insurers argue that they are not liable for breach of warranty and that the policy only covered ADLS for negligent acts. Since the trial judge found, and the Appeals Court concurred, that ADLS was not negligent in relying on the representations of Data General (the hardware manufacturer) that the problem of poor response time could be solved, the insurers claim there is no coverage.

An "errors and omissions" policy covers more than negligent acts. The language of the policy insures against loss "by reason of any negligent act, error or omission." Not only would the insurers' narrow reading ignore the standard dictionary definitions of error[5] and render the words "error or omission" in the policy redundant, but also, despite their claims to the contrary, the authorities view such policies more broadly. "An errors-and-omissions policy . . . is designed to insure members of a particular professional group from the liability arising out of a special risk such as negligence, omissions, mistakes and errors inherent in the practice of the professions." 7A Appleman, Insurance Law and Practice § 4504.01 at 310 (1979). See *Aitchison* v. *Founders Ins. Co.*, 166 Cal. App. 2d 432, 438-439 (1958) (policy language "by reason of a negligent act, error or omission," covered damages occasioned by non-negligent, honest

---

[5]Error is defined in Black's Law Dictionary (6th ed. 1990) at 542, as "[a] mistaken judgment or incorrect belief as to the existence or effect of matters of fact, or a false or mistaken conception or application of the law." It is defined in The American Heritage Dictionary, 2d ed. College (1991) at 463, in part, as follows: "(1) An act, assertion, or belief that unintentionally deviates from what is correct, right, or true. (2) The condition of having incorrect or false knowledge." The definitions in Webster's Third New Intl. Dictionary (1971) at 772 are: "(b) an act involving an unintentional deviation from truth or accuracy: a mistake in perception, reasoning, recollection, or expression . . . ; (c) an act that through ignorance, deficiency, or accident departs from or fails to achieve what should be done."

but mistaken belief that tungsten was domestic, when it was foreign, and thereby, in breach of contract). See also *Continental Cas. Co.* v. *Cole*, 809 F.2d 891, 896 (D.C. Cir. 1987) (policy language "error, negligent omission or negligent act of the insured" covered all errors, not only negligent ones, and included intentional acts); *First Newton Natl. Bank* v. *General Cas. Co.*, 426 N.W.2d 618, 629 (Iowa 1988) (exclusion in policy for "claims arising out of error or omission or a mistake committed . . . by the insured" did not include negligence, hence policy covered negligence claims); *Touchette Corp.* v. *Merchants Mut. Ins. Co.*, 76 A.D.2d 7, 10 (N.Y. 1980) (where policy covered damages "caused by any negligent act, error or omission," court left for a determination after trial question whether there would be coverage for nonnegligent breach of contract). The cases cited by the insurers, *Golf Course Superintendents Assn.* v. *Underwriters at Lloyd's London*, 761 F. Supp. 1485 (D. Kan. 1991), and *United States Fid. & Guar. Co.* v. *Fireman's Fund Ins. Co.*, 896 F.2d 200, 203 (6th Cir. 1990), are distinguishable as they involve intentional acts such as discrimination, and the policies contain exclusions for dishonest or intentional acts.

In any event, both the terms "consulting business" and "error" in the context of the policies and the business of ADL and its subsidiaries, which was known to the insurers, are at least ambiguous and are reasonably susceptible of encompassing the actions of ADLS which constituted a design defect under its contract. See *Jefferson Ins. Co.* v. *Holyoke*, 23 Mass. App. Ct. at 474 (ambiguity exists if language "susceptible of more than one meaning").

It is well established that where the insurer drafts the policy, all ambiguities are resolved against it. *Worcester Ins. Co.* v. *Fells Acres Day Sch., Inc.*, 408 Mass. 393, 414 (1990), and cases cited. Although the insurers urge that this normal rule of construction should not apply because ADLS's parent was a party with equal sophistication and bargaining power, there is nothing in the record to suggest that ADLS's parent participated in the drafting of the policies.

.

3. We turn to the exclusions contained in the policies on which the insurers also rely. The first, exclusion "e," precludes coverage:

> "(e) arising out of errors or omissions in the design of any tangible product or substance (design as used herein shall not include a textual representation of preliminary and conceptual design even if the textual material includes drawings of component aspects of a product or substance or a conceptual rendering of the final product or substance); however, the Company agrees to indemnify the Insured for costs and expenses incurred in the defense of any claim arising out of such design errors or omissions."

The insurers' bald claim that a turnkey computer system is a tangible product is not an indubitable proposition. As was explained in the underlying case, 28 Mass. App. Ct. at 117 n.9, a turnkey system is a combination of both hardware and software, a package which is ready to function immediately. As suggested in note 4, *supra,* the trend is toward finding turnkey and software systems to be "goods" under the UCC. Courts reach that result using different language. Thus, the trial court in *Triangle Underwriters, Inc.* v. *Honeywell, Inc.,* 457 F. Supp. 765, 769 (E.D.N.Y. 1978), aff'd. in part, rev'd. in part, 604 F.2d 737 (2d Cir. 1979), explained:

> "Although the ideas or concepts involved in the custom designed software remained Honeywell's intellectual property, Triangle was purchasing the product of those concepts. That product required efforts to produce, but it was a product nevertheless and, though *intangible,* is more readily characterized as 'goods' than 'services.' *Intangibles* may be 'goods' within the meaning of [the] U.C.C." (emphasis supplied).[6]

---

[6]In the tax context, software is usually considered intangible personal property, and it has been said that "[a]lmost all states which have considered the nature of computer software have found that the software is in-

See also Note, Computer Software as a Good Under the Uniform Commercial Code: Taking a Byte Out of the Intangibility Myth, 65 B.U.L. Rev. 129, 138 (1985), where the author points out that the legal distinctions between tangible and intangible property have begun to erode, and that

> "[u]nder the UCC the determination of whether or not a particular res is a good is based upon its movability at the time of identification to the contract. In order for a piece of property to be movable and identifiable, it is necessary that the thing exist, but identification need not be so absolute or specific that the item is cognizable to the senses. A thing need not be capable of being felt for it to be movable."

Compare *Advent Sys. Ltd.* v. *Unisys Corp.*, 925 F.2d 670, 675 (3rd Cir. 1991), a case in which software was the major portion of the product. The court, in finding that the UCC applied to software per se, stated: "once in the form of a floppy disc or other medium, the program is tangible, moveable and available in the marketplace." Turnkey systems and software, while usually treated as "goods" under the UCC, are thus considered intangible by some, but not all, authorities.

One of the questions asked of ADL by the insurers on their proposal form is helpful in interpreting the exclusion. That question was: "Does the firm actually design any tangible products or structures or production systems?" The answer was "Yes," and referred to "Attachment No. 3." That attachment stated: "Occasionally, new products and unique structures and systems in no set subject area." Despite the question and the answer, both of which covered more than just tangible products, the exclusion as drafted referred only to "tangible products or substances." Since the term "tangible" in the exclusion is at least ambiguous when applied to software and turnkey systems, and since "[e]xclusions from

---

tangible personal property." *In re Tax Protest of Strayer*, 239 Kan. 136, 138 (1986), and cases cited.

coverage are to be strictly construed," *Vappi & Co.* v. *Aetna Cas. & Sur. Co.*, 348 Mass. 427, 431 (1965), we hold exclusion (e) inapplicable.

The other exclusion relied on by the insurers is "h" which excludes coverage "for liability assumed by the Insured under any contract unless such liability would have attached to the Insured by reason of negligent acts, errors or omissions committed in connection with the operations of the Insured in the absence of such a contract."

Following the analysis in *Wolov* v. *Michaud Bus Lines, Inc.*, 21 Mass. App. Ct. 60, 63 & n.7 (1985), we reject the interpretation of the insurers that ADLS's liability, which it incurred by reason of its breach of warranty, is excluded. "[C]ommon sense, as well as decided cases, suggest that in the present policy the clause 'liability assumed by the insured under any contract . . .' probably refers to arrangements very different from the" contract for a turnkey system between ADLS and USM: "the interpretation urged [by the insurers] would greatly reduce the protection afforded to [ADLS] on its ordinary operations which . . . [always] arise[7] from agreements of some kind." *Id.* at 63. The court at this point, at 63 n.7, cited to *Olympic, Inc.* v. *Providence Wash. Ins. Co.*, 648 P.2d 1008 (Alaska 1982). *Olympic*, at 1011, explained that " '[l]iability assumed by the insured under any contract' refers to liability incurred when one promises to indemnify or hold harmless another, and does not refer to the liability that results from breach of contract." Since ADLS is liable for breach of contract, exclusion (h) does not apply.

4. The insurers also claim that there is a genuine issue of material fact as to whether ADLS had knowledge or could reasonably have foreseen that such "negligent acts, errors or

---

[7]In the proposal form, the insurers asked ADLS's parent: "Do you have written contracts with every client?" The answer was "yes." The form also asked: "To what extent does the contract limit your liability to your clients?" The answer given was: "An attempt is made to limit liability to amount paid for work done. This is current policy, but exceptions are made by management. Current experience is that 8% of contracts omit the limit of liability provision."

omissions could be the basis of a claim or suit." See note 3, *supra.* In the underlying action, the trial judge found that by June, 1977, it had become clear that there were major problems with the system, and, although he also found that USM did not consider ADLS in breach of the agreement until September 27, 1979, and had even paid an installment in November, 1978, that it had been withholding until work was "complete," there are indications in the record that there was some dissatisfaction[8] on the part of USM because of the series of failed attempts, over a two-year period, to make the system work. See 28 Mass. App. Ct. at 115.

Whether that dissatisfaction was a sufficient indication that a claim might or would be made, requiring notice to the insurers, see *General Acc. Ins. Co.* v. *Trefts,* 657 F. Supp. 164, 167 (E.D. Mo. 1987), is a material question of fact on which, to this point, no trier of fact has focused. Cf. *Sheehan* v. *Aetna Life Ins. Co.,* 296 Mass 535, 541 (1937). We think that issue was sufficiently raised in the insurers' opposition to the plaintiff's motion for summary judgment.[9] We caution that ADLS was not required to give notice to the insurers of every disagreement or problem with work for a client which could possibly be the basis of a claim. Cf. *Evanston Ins. Co.* v. *GAB Bus. Servs., Inc.,* 132 A.D.2d 180, 186 (N.Y. 1987).

5. The insurers also seek a remand on the issue of damages. In their opposition to the plaintiff's motion for summary judgment, they did not raise any issue as to damages. In support of its motion for summary judgment, the plaintiff attached its memorandum of damages which had been the basis of its claims as well as the basis for the amount of the judgment which had entered in its favor. Not having raised the issue prior to the motion judge's ruling in this action, the

---

[8]Although USM claims the evidence of dissatisfaction was not in proper form, it did not object to its consideration below and hence may not raise the issue now.

[9]To the extent that there is a question of fact whether the insurers waived this defense, this should be determined on remand. Although USM may not have raised the question of waiver of this defense below, we consider "notice" and "waiver" to be sufficiently connected that both issues of fact should be determined on remand.

insurers can only appeal from the denial of these claims made in their postjudgment motions. The judge was, however, not required to rule on claims not made prior to his decision on the motion for summary judgment, and we see no abuse of discretion in his disallowing the postjudgment motions.

This is not a case where we are inclined to exercise our discretion to consider an issue not argued below on the ground that injustice might otherwise result. See *Scannell* v. *Ed. Ferreirinha & Irmao, Lda.*, 401 Mass. 155, 163 (1987). The insurers were given full opportunity, indeed, ADLS specifically asked them, to participate in the determination of damages, indicating it was contemplating filing for bankruptcy, yet they declined to do so.[10]

To summarize, we decide that the policies covered ADLS's liability except that there is an issue of fact as to whether ADLS complied with the notice provisions of the policy. Accordingly, we affirm the judgment insofar as it declares that the policies provide coverage to ADLS for the conduct which gave rise to its liability to USM, but remand for a determination of the notice issue. On remand, USM may also raise any question of fact as to waiver of this defense. See note 9, *supra.*

*So ordered.*

---

[10]Although the insurers claim ADLS did not provide an adequate defense (see generally Restatement [Second] of Judgments § 57 comment b [1982]), there is no record support for this claim. That the insured had filed in bankruptcy is not here as important as in some cases since the insurers were bound to pay for costs and expenses of defense in excess of $1,000,000, see exclusion (e), *supra* at 477, and had agreed in a letter to pay such costs. It appears that the $1,000,000 deduction had been reached prior to the remand for determination of damages.