MONTGOMERY COUNTY, Appellant,

v.

MICROVOTE CORPORATION; Carson Manufacturing Company, Inc.; Westchester Fire Insurance Co., Inc.

No. 98–1923.

United States Court of Appeals, Third Circuit.

Argued March 26, 1999.

Filed April 30, 1999.

Timothy T. Myers (Argued), John M. Elliott, Krista K. Beatty, Brian J. McCormick, Jr., Elliott, Reihner, Siedzikowski & Egan, Blue Bell, PA, for Appellant.

Samuel E. Klein, Robert C. Clothier, III, Dechert, Price & Rhoads, Philadelphia, PA, for Appellee MicroVote Corporation.

Michael T. Scott (Argued), Reed, Smith, Shaw & McClay, Philadelphia, PA, Scott R. Alexander, Gayle A. Reindl, Sommer & Barnard, Indianapolis, IN, for Appellee Carson Manufacturing Company, Inc.

Robert T. Carlton, Jr., Ellsworth, Wiles & Chalphin, Philadelphia, PA, for Appellee Westchester Fire Insurance Co., Inc.

Before: GREENBERG, ROTH, and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal raises an important question regarding the presence and scope of the attorney-client privilege. The defendant Carson Manufacturing Company ("Carson") seeks to discover six documents generated by Michael I. Shamos, a member of the Bar of Pennsylvania who holds a Ph.D. in computer science. Carson claims that the documents are discoverable because Shamos was acting as a consultant, rather than an attorney, for plaintiff Montgomery County ("County"). The United States District Court for the Eastern District of Pennsylvania agreed and held, *inter alia*, that the documents Shamos created were not protected by the attorney-client privilege. Our review of the record, however, compels us to conclude that Shamos, who was retained through his law firm and participated in contract negotiations, acted as the County's attorney and, thus, the attorney-client privilege precludes discovery of five of the documents. We therefore vacate the order of the district court in part and affirm as to one of the documents.

### I.

On May 25, 1994, for a price exceeding four million dollars, Montgomery County purchased nine hundred MICRO-VOTE–464 Electronic Voting Computer and Direct Electronic Voting Units from defendant MicroVote Corporation ("MicroVote"). Carson manufactured these electronic voting machines.

Montgomery County used these machines in the 1994 and 1995 general elections and the 1995 primary election. In November 1995, the County for the first time used the machines county-wide for a multi-page ballot. According to the County, the machines malfunctioned during that election. When voters scrolled the ballot to proceed to the next page, the machines sometimes shut down. The power failures created long lines at the polls. Some vot-ers waited two hours, and others went home without voting. After the polls closed, the MicroVote software miscalculated the results. Consequently, County officials gave erroneous results to the press, which reported incorrect election winners.

After the difficulties experienced during the November 1995 election, County officials decided to retain someone to analyze past elections and make recommendations to secure properly functioning voting machines for upcoming elections. As described by Thomas E. Waters., Jr., Montgomery County Solicitor, the County was "looking for an expert who could evaluate the performance of the machines, tell [the County] what was wrong with them, tell [the County] whether it was fixable, and tell [the County] whether or not [the County] could use the machines if [the County] wanted to." Joseph Passarella, Montgomery County Director of Voter Services, contacted five election experts who had been recommended by the County Commissioners or the Pennsylvania State Department. Shamos was the only attorney included in the list of experts. He worked for the Commonwealth of Pennsylvania certifying voting machines, including the MICROVOTE–464. Shamos was willing and able to work for Montgomery County. The other four experts were not interested in consulting for the County.

The County Commissioners ultimately decided to retain Webb Ziesenheim Bruening Logsdon Orkin & Hanson P.C. ("Webb Law Firm"), of which Shamos is a partner. On January 30, 1996, Montgomery County entered into a fee agreement with the Webb Law Firm. The letter confirming the fee agreement states: "This letter acknowledges the engagement by Montgomery County of Webb Ziesenheim Bruening Logsdon Orkin & Hanson, P.C. as counsel in connection with rendering advice on contractual relations with the county's present vendor of electronic voting systems." Two days later, at a County Board

of Elections meeting, the County retained the Webb Law Firm.

Shamos performed several tasks for the County. On February 1, 1996, Shamos attended a morning meeting between Montgomery County, Carson, and Micro-Vote officials, during which they discussed options available to the County to resolve the problem caused by the malfunctioning voting machines. At a meeting with MicroVote and Carson officials later that day, Shamos told MicroVote that he would not positively recommend MicroVote's machines to the County unless he received specific information and proposals. The following day, Shamos met with officials from MicroVote and Carson. Shamos conditioned a positive recommendation on MicroVote giving the County a one-hundred-percent performance bond or letter of credit and conditioning the recovery of the bond on the machines' performing at a specific level. On February 5, 1996, MicroVote sent Shamos a draft of its proposals, which Shamos critiqued in a letter to the president of MicroVote on the following day.

On February 20, 1996, Shamos sent Passarella, the County's Director of Voting Services, a seven-page letter in which Shamos is believed to have made his findings and recommendations to Montgomery County. This letter, which was not part of the district court record, is the key document that Carson seeks and the County has been trying to protect.

According to Passarella's hearing testimony, in February 1996, Shamos and County Solicitor Waters negotiated with Dean Richards, MicroVote's counsel, and helped write an addendum to the contract between Montgomery County and Micro-Vote. In the addendum, which was executed on March 13, 1996, MicroVote agreed to provide the County with 390 additional MICROVOTE–464 voting machines for the April 1996 primary elections.

Shamos performed services for Montgomery County until March 12, 1996. Shamos was the only Webb Law Firm attorney who billed the County for services rendered. The County paid its fees for Shamos's services to the Webb Law Firm, not directly to Shamos.

At times, County officials called Shamos a consultant. The minutes of the February 2, 1996 Board of Elections meeting reported: "[T]he County is hiring a consultant to ensure there will not be a repetition of the previous election day problems." The minutes added that Shamos "has been chosen as a consultant at a rate of $175.00 per hour, for a projected four [4] day consult. Dr. Shamos will analyze and prepare recommendations to remedy the County's electronic voting system difficulties." The Board of Elections adopted a resolution retaining the Webb Law Firm's services as a consultant. The resolution specifically mentioned that the County was engaging Shamos. In a letter written on February 7, 1996, County Commissioner Chairman Mario Mele referred to Shamos as a consultant. The minutes taken at the February 22, 1996 Board of Elections meeting called Shamos "the County's Consultant."

Other County officials and MicroVote's counsel considered Shamos to have been its counsel. In his testimony delivered at the hearing before the district court to determine if the Shamos report was privileged, Passarella said that the County retained the Webb Law Firm to consider all of the County's options, including litigation. He referred to Shamos as counsel and said that the engagement letter called the Webb Law Firm counsel. In his deposition, Waters testified that Shamos was acting as the County's lawyer. A March 1, 1996 letter from Richards to Waters stated that Shamos "previously represented the County" in connection with the voting machine dispute.

The problems with the MicroVote voting machines persisted in the April 1996 primary elections. Afterward, relations between the parties grew rancorous. On July 1, 1996, MicroVote sued the County

for allegedly breaching an oral contract. That suit was dismissed. On October 10, 1997, Montgomery County filed this diversity action with the United States District Court for the Eastern District of Pennsylvania. In its complaint, the County alleged, *inter alia*, negligence, breach of warranty, breach of contract, and fraud.

In its request for production of documents, Carson sought from the County "[t]he report of Dr. Shamos concerning the 1995 election and/or the performance of the voting machines and all other documents generated by and/or provided to Dr. Shamos" ("Shamos documents"). The County asserted that the Shamos documents were not discoverable under the attorney-client and work-product privileges. Neither Shamos nor the Webb Law Firm has represented the County in either suit.

On July 2, 1998, Carson filed a motion to compel discovery, and the district court held a hearing on August 21, 1998. On September 24, 1998, the court ordered the County to produce to Carson six documents, which the court dubbed "the Shamos Report." The "report" comprises:

(1) 1/30/96 fee agreement letter
(2) 2/29/96 bill for services
(3) 3/31/96 bill for services
(4) 2/5/96 one-page letter from Shamos to Passarella
(5) 2/13/96 fax cover sheet from Passarella to Shamos
(6) 2/20/96 seven-page letter from Shamos to Passarella

In its memorandum and order, the district court concluded that the County hired Shamos as an election consultant, not as an attorney. Consequently, the court held that the Shamos documents were not protected by the attorney-client privilege. The court also determined that the work-product privilege did not protect the documents.

The County appeals from the discovery order.

## II.

### A.

■ As a threshold matter, we hold that we have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. The collateral order doctrine permits, under narrowly defined circumstances, appeals from nonfinal orders pursuant to § 1291. *See, e.g., Cohen v. Beneficial Loan Corp.,* 337 U.S. 541, 545–57, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). This court has held that a discovery order requiring disclosure of material putatively protected by the attorney-client and work-product privileges is appealable under the collateral order doctrine. *In re Ford Motor Co.,* 110 F.3d 954, 964 (3d Cir.1997).

■ Carson urges us to revisit our holding in *In re Ford Motor Co.* Because we are bound by the prior decisions of this court and lack the authority to reconsider decisions by previous panels, we must decline that invitation. *See* Internal Operating Procedures 9.1 (1997). MicroVote maintains that *In re Ford Motor Co.* requires a case-by-case analysis of the importance of the privilege under the facts of each case. We disagree. In *In re Ford Motor Co.,* this court did not base its appealability holding on the underlying facts; rather, this court examined the policies underlying the final judgment rule and the attorney-client and work-product privileges. 110 F.3d at 958–64. Thus, *In re Ford Motor Co.* established a bright-line rule permitting appeals from discovery orders requiring the disclosure of content putatively privileged by the attorney-client and work-product privileges.

In this case the district court's discovery order required the County to give Carson the Shamos documents, which the County contends are protected by the attorney-client and work-product privileges. Under the collateral order doctrine, we have appellate jurisdiction over the County's appeal from that order.

## B.

We now confront the central issue on this appeal: whether the attorney-client privilege precludes the discovery of the Shamos documents. Carson argues that the documents are not privileged because at all times Shamos performed services for the County, he acted as a consultant and not as legal counsel.

The district court agreed. The court ruled that the County failed to prove that Shamos and the Webb Law Firm were retained to render legal advice in the form of recommendations pertaining to the voting machines. The court concluded that the County did not hire Shamos for the purpose of securing legal advice and that the County hired him as an election consultant. The court determined that when Shamos negotiated an addendum to the County's contract with MicroVote, he was acting as a consultant rather than an attorney. The court added that Shamos's private meetings with MicroVote and Carson officials were inconsistent with the actions of an attorney representing an adverse party and potentially violated Rule 4.2 of the Pennsylvania Rules of Professional Conduct. The court, therefore, held that the County retained Shamos as a consultant, not an attorney, and that the attorney-client privilege did not protect the Shamos documents from discovery.

■ We exercise plenary review over the district court's discovery order rejecting claims of attorney-client privilege. *In re Ford Motor Co.*, 110 F.3d at 966. The District Court's factual findings should not be disturbed unless they are clearly erroneous. *United States v. Brown*, 159 F.3d 147, 148 (3d Cir.1998). However, we have plenary review over mixed questions of fact and law. *Jenkins v. Manning*, 116 F.3d 685, 688 (3d Cir.1997).

■ Because this diversity action arises under Pennsylvania law, we apply Pennsylvania privilege law. *See In re Grand Jury Investigation*, 918 F.2d 374, 379 n. 6 (3d Cir.1990). Pennsylvania has codified the attorney-client privilege as follows: "In a civil matter counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client." 42 Pa.Cons.Stat.Ann. § 5928 (West 1982).

The traditional elements of the attorney client privilege that identify communications that may be protected from disclosure in discovery are: (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his or her subordinate, and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion of law or (ii) legal services or (iii) assistance in some legal proceeding, and (d) not for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Rhone–Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 862 (3d Cir.1994).

■ The crucial, intertwined issues in this case are whether Shamos acted as a lawyer when he created or received the documents and whether the County sought legal services from Shamos. *See In re Ford Motor Co.*, 110 F.3d at 965 ("The communications must be for the purpose of obtaining legal advice."); *Yi v. Commonwealth, Dep't of Transp., Bureau of Licensing*, 166 Pa.Cmwlth. 214, 646 A.2d 603, 605 (1994) ("[T]he attorney-client privilege demands the existence of a relationship in which an attorney is acting in his professional capacity as a lawyer."). These are mixed questions of fact and law over which we have plenary review. *Cf. United States v. Inigo*, 925 F.2d 641, 656 (3d Cir.1991) (determining whether crime-fraud exception to attorney-client privilege applies is

mixed question of fact and law). If Shamos acted as an attorney from whom the County sought legal services, then the attorney-client privilege is implicated.

Neither the district court nor any of the parties have defined what is a "consultant." Webster's Unabridged International Dictionary defines a consultant as one "who gives professional advice or services in the field of his special knowledge or training, as a consulting physician or engineer." *Webster's Third New International Dictionary of the English Language, Unabridged*, 490 (1966); *see also U.S.M. Corp. v. First State Ins. Co.*, 37 Mass.App. Ct. 471, 641 N.E.2d 115, 117 (1994) (adopting Webster's definition of consultant), *aff'd in part and rev'd in part*, 420 Mass. 865, 652 N.E.2d 613 (1995). Lawyers have training in and special knowledge of the law and often are consulted for such purposes. Many have expertise in special areas of knowledge that enhances their skill as lawyers, and that does not diminish their legal status.

Thus, the manner in which a person is hired and the resulting services that are performed are of the utmost significance in determining the capacity in which the person was engaged. By letter dated January 30, 1996, Montgomery County hired the Webb Law Firm, not Shamos, although he was a law partner. They agreed to pay a specific rate of $175 per hour, a fee arrangement, although not the hourly rate, common in the legal profession. The engagement letter contemplated that the Webb Law Firm would perform legal services, referred to the law firm as counsel to render advice on contractual relations with the County's vendor of voting systems, and called for the utilization of lawyers, paralegals, and other people in the law firm. (382A) The Webb Law Firm billed the county for Shamos's services, and the County paid the Firm. Moreover, Richards, attorney for Micro-Vote, once wrote that Shamos represented the County, and Passarella and Waters both testified that Shamos had been counsel for the County.

Immediately after the Webb Law Firm, had been hired, Shamos met on February 1, 1995, with the Commissioners and officers of MicroVote in an effort to settle the controversy between the parties. Several days later the Webb Law Firm over Shamos's signature wrote MicroVote informing it that the County would require (1) a bond for the full amount of the original contract and (2) MicroVote's acknowledgment that the County will be entitled to a full refund in the event the performance criteria (to be agreed upon) are not met. The letter makes no reference whatsoever to the technical malfunctions or operational problems of the voting systems but confines itself to the County's legal requirements of MicroVote with respect to any settlement.

Thereafter, Shamos participated with County Solicitor Waters and MicroVote representatives in settlement negotiations that eventually led to the negotiation and drafting of the addendum agreement with MicroVote's counsel. This agreement, set forth as a formal legal document, duly attested and sealed, commences with Pennsylvania's statutory statement of legal consideration, sets forth the terms of a proposed settlement, and also provides that no other writing, proposals or other oral agreements "(except MicroVote's February 15, 1996 memorandum from James F. Ries to Dr. Michael Shamos) are binding upon the parties except as set out in the original contract and this addendum." The addendum concludes with an agreement of the parties that MicroVote was not in violation of its February 15, 1996 memorandum from Ries, MicroVote's president, to Shamos.

Negotiating and drafting this addendum appears to be Shamos's most significant service to the County. It is first and last legal in its scope, typical of the service a lawyer performs; it does not appertain to the engineering or electronic structure and malfunction of the voting machines. Ne-

gotiating, drafting or assisting in the creation of the addendum to the contract in an effort to resolve the dispute between the County and MicroVote is at the heart of a lawyer's task. Furthermore, Shamos gave the County advice on how to address its predicament with the voting machines in a manner calculated to reduce the likelihood of prolonged and costly litigation.

Thus, the County not only proved that it engaged the Webb Law Firm to provide important legal services for it and to advise it and make recommendations in connection with its serious dilemma over the election machines; it proved that the services he rendered were entirely legal. They are within the competence of a seasoned attorney, particularly one familiar with Pennsylvania's election laws.

■■■ There may be evidence that the County chose the Webb Law Firm as a "consultant," but the loose use of the term does not alone denude a lawyer of his legal character. Engaging an attorney as a consultant for advice in solving a serious legal problem no more strips him of his legal attributes than does the consultation with a doctor over a medical problem relieve the doctor of his medical attributes. It is not uncommon for public entities, including state and local governments, which have appointed attorneys, to engage outside lawyers for advice or for trial in meeting difficult or unusual problems. It is very important in the practice of law, especially matters of great public interest to a county such as a troublesome controversy over an expensive but highly unsatisfactory electronic voting system, that the county have complete freedom of consultation fostered by the client-attorney privilege. The services need not be rendered in conjunction with actual or potential litigation to qualify for the privilege. 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 503.13[1] (Joseph M. McLaughlin, ed., 1997).

Carson's contention that Shamos negotiated the contract as a lay consultant does not warrant discussion; there is no evidence to support it. We reject it. Lay people rarely draft and negotiate contracts in behalf of a governmental entity; that would constitute the unauthorized practice of law.

The County sought Shamos's legal services despite its earlier solicitation, prior to retaining Shamos, of four election consultants who were not attorneys. Although the County explored retaining a consultant who was not a member of the bar, the County decided to retain Shamos, an attorney. Thereafter, the County sought, and Shamos performed, legal services, including negotiating a contract and rendering advice. Even if the County had not contemplated utilizing Shamos's legal acumen when it initially solicited his services, the County, notwithstanding some of its officials' occasional characterizations of Shamos as a consultant, ultimately had Shamos perform legal services for it.

Shamos's private meetings with MicroVote and Carson do not suggest that Shamos was not acting as a lawyer when he prepared or obtained the Shamos documents. Although Shamos was barred from meeting MicroVote or Carson officials without receiving permission from these companies' attorneys, *see* Pa. Rule of Prof. Conduct 4.2, the record contains no evidence that Shamos breached his ethical duties. In addition, it is not unusual for an attorney to meet with potential adversaries during investigations or negotiations.

■■■ We believe that the district court erred when it concluded that the County failed to prove that Shamos and the Webb Law Firm were retained to render legal services in the form of recommendations relating to the voting machine dispute. We conclude that when Shamos created or received the documents that Carson seeks to discover, Shamos was acting as a lawyer and performing legal services for and sought by Montgomery County. Therefore, we hold that Shamos's written communications with Passarella are protected by the attorney-client privi-

lege, "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). The privilege is of special importance to a governmental entity in seeking legal advice in protecting its constituents' rights to an efficient and accurate voting system. The Webb Law Firm's billing records are also privileged because they reveal the nature of the services Shamos rendered. *See, e.g., Fidelity & Deposit Co. of Maryland v. McCulloch,* 168 F.R.D. 516, 523 (E.D.Pa.1996) (holding billing records subject to attorney-client privilege to extent records reveal nature of services performed). Accordingly, we need not address the County's arguments that these five documents are protected by the work-product privilege or as the opinion of a non-testifying expert.

 However, the fee agreement letter is not privileged. The attorney-client privilege does not shield fee arrangements. *In re Grand Jury Investigation,* 631 F.2d 17, 19 (3d Cir.1980) (holding attorney-client privilege does not protect fee arrangements absent strong probability that disclosure would implicate client in criminal activity for which client sought legal advice). Furthermore, the fee agreement letter does not come within the ambit of the work-product privilege, *see Murray v. Stuckey's Inc.,* 153 F.R.D. 151, 153 (N.D.Iowa 1993), and of course is not the opinion of a non-testifying expert.

### C.

 Carson contends that the County waived the attorney-client privilege when Shamos disclosed his thought processes in his meetings with MicroVote and Carson on February 1 and 2, 1996. Carson claims that the County once again waived the privilege at a County Election Board meeting on February 22, 1996, during which the County allegedly revealed Shamos's thought processes, findings, and recommendations by allowing Ries, president of MicroVote, to disclose a list of actions that MicroVote, after conferring with Shamos, agreed to take prior to the April 1996 primary elections.

 Generally, "when a client voluntarily discloses privileged communications [with an attorney] to a third party, the privilege is waived." *Westinghouse v. Republic of the Philippines,* 951 F.2d 1414, 1424 (3d Cir.1991). In addition, voluntary disclosure to one's adversary of documents protected by the work-product privilege waives the privilege. *Id.* at 1428.

Carson does not allege that Shamos, the Webb Law Firm, or Montgomery County disclosed a portion of any of the Shamos documents. However, the documents, not Shamos's thought processes, findings, or recommendations, are protected by the privilege. Because the Shamos documents were not themselves disclosed, Montgomery County did not waive the attorney-client privilege.

### III.

The district court's order compelling Montgomery County to produce the Shamos documents will be vacated with respect to all documents except for the fee agreement letter and the case remanded for further proceedings consistent with this opinion. Costs will be taxed against the appellees.

GREENBERG, Circuit Judge, concurring:

I concur with the majority's disposition of this case, but reach its result on different grounds.[1] While I respect the majority's view, I believe there are strong grounds here for the application of the work product doctrine. I conclude that the documents in issue are protected from

---

**1.** Judge Roth and Judge Rosenn also join in the concurrence because they are of the opinion that both the attorney-client and the work product privileges apply under the facts of this case.

discovery because they are work product produced by an expert consultant in anticipation of litigation. See *In re Grand Jury (Impounded)*, 138 F.3d 978, 981 (3d Cir. 1998); *Conoco, Inc. v. United States Dep't of Justice*, 687 F.2d 724, 730 (3d Cir.1982).

The work product doctrine allows a party to discover material prepared in anticipation of litigation or for trial only when the requesting party has shown a substantial need for the material and cannot obtain the material or its equivalent elsewhere without incurring a substantial hardship. *See* Fed. R. Civ. P. 26(b)(3); *Carson v. Mar–Tee Inc.*, 165 F.R.D. 48, 50 (E.D.Pa.1996). The rule provides that "[i]n ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." *Id.* The party asserting work product protection has the burden of demonstrating that the documents were "prepared in anticipation of litigation." *Conoco*, 687 F.2d at 730. The fact that the documents sought for discovery do not include legal advice is, "as a matter of law, irrelevant provided ... they were prepared in anticipation of litigation." *In re Ford Motor Co. .*, 110 F.3d 954, 968 (3d Cir.1997). Thus, the February 20, 1996 letter from Shamos to Passarella and the other communications in issue can be privileged work product even if they do not meet the standard for protection under the attorney-client privilege.

Significantly, the district court in its September 24, 1998 order recognized that in this case "litigation was always a possibility." But the court emphasized that the County hired Shamos not in anticipation of litigation, but towards *avoiding* litigation by "recommending other courses of action to the County regarding the voting machine difficulties...." (Emphasis added). I think that the distinction between "anticipate" and "avoid" is uncertain: at what point are strategies to "avoid litigation"

also tactics anticipatory of litigation? How can one avoid what one has not even anticipated? *Leonen v. Johns–Manville*, 135 F.R.D. 94, 96 (D.N.J.1990) ("The phrase, 'anticipation of litigation' is incapable of precise definition.").

The dilemma is resolved by turning to the record. *See United States v. Rockwell Int'l*, 897 F.2d 1255, 1266 (3d Cir.1990) ("The question whether a document was prepared in anticipation of litigation is often a difficult factual matter."). This court defines documents as being prepared "in anticipation of litigation" when, "in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation." *In re Grand Jury Proceedings*, 604 F.2d 798, 803 (3d Cir.1979). We have explained that the preparer's anticipation of litigation must be objectively reasonable. *Martin v. Bally's Park Place Hotel & Casino*, 983 F.2d 1252, 1260 (3d Cir.1993).

How remote a prospect can the litigation be for the anticipation to be "reasonable"? A party must show that there existed "an identifiable specific claim or impending litigation when the materials were prepared." *Leonen*, 135 F.R.D. at 97. "[T]he mere fact that litigation did in fact occur, that a party has consulted or retained an attorney, that a party has undertaken investigation, or engaged in negotiations over the claim, is not enough to establish a reasonable anticipation of litigation under Rule 26(b)(3)." *United States v. Ernstoff*, 183 F.R.D. 148, 155 (D.N.J.1998) (internal citations omitted). Here, although when the County hired the Webb Law Firm, and thus Shamos, the parties were primarily trying to "avoid" litigation by satisfying their agreement, "[a] party ... does not have to be threatened with litigation by a plaintiff ... before the documents it prepares could be considered prepared in anticipation of litigation." *Hydramar, Inc. v. General Dynamics Corp.*, 115 F.R.D. 147, 150 n. 3 (E.D.Pa.1986) (internal quotation

marks omitted). Within one month of hiring Shamos, the County in a March 1, 1996 letter to MicroVote, stated that it considered MicroVote to be in default. App. at 196. The parties knew that the agreement was being questioned and revised, and that the County was concerned about whether MicroVote was in breach—a concern it announced publicly on March 1, 1996. App. at 197. By that point, litigation was "anticipated" to some degree by both sides, at least in part by the very fact of Shamos' expert consultations with both parties, as well as by the involvement of attorneys Waters and Richards.

Moreover, it is clear that Shamos did not make the evaluation of the election system in the ordinary course of business: the County did not periodically hire an expert to see how the system was running, but sought and engaged an expert because of problems with previous elections, and its belief that MicroVote might not have performed its agreement adequately. *See, e.g., Harper v. Auto–Owners Ins. Co.,* 138 F.R.D. 655, 661 (S.D.Ind.1991) ("[A] report produced at a time when litigation was justifiably anticipated is not work product if the report was produced in the ordinary course of the party's business."). Although it is troubling, as the district court notes, that Shamos met with MicroVote and Carson without their being represented by their own counsel, the issue for us is whether the County viewed Shamos' work as "primarily" aiding it in avoiding or preparing for future litigation, and it has shown that this is the case. For these reasons, I accept the County's contention that the "primary motivating purpose behind the creation of the [Shamos Report]" was "to aid in possible future litigation." *United States v. Rockwell Int'l,* 897 F.2d at 1266 (*citing United States v. El Paso Co.,* 682 F.2d 530, 542–43 (5th Cir.1982)).

Fact-based reports like Shamos' letter have been found to be clearly protected by the work product privilege. *In re Ford Motor,* for example, involved agendas prepared by a consultant to Ford for a meeting he would attend. Ford's counsel also attended that meeting, which was called in part so that the consultant could explain technical aspects of Ford's defense regarding product liability claims. One of the agendas contained hand-written notes by the consultant. This court found that the "agendas disclose[d] material prepared as part of Ford's legal strategy.... The agendas outline[d] the results of studies conducted as to the safety of [Ford's vehicle] and, in so doing, highlight[ed] important aspects of those studies." *In re Ford Motor,* 110 F.3d at 967. Similarly, the communications at issue here, especially the February 20 letter, were sought and prepared in anticipation of litigation.

Because the County has met its burden of showing that the Shamos report was prepared in anticipation of litigation, Carson has the burden of overcoming the protection. *In re Grand Jury Investigation,* 599 F.2d 1224, 1230 (3d Cir.1979). Absent its showing of substantial need, we cannot compel discovery of work product protected by Rule 26(b)(3). *Carson v. Mar–Tee,* 165 F.R.D. at 50. Carson has not demonstrated "substantial need," so the privilege stands.

For the above reasons, I concur with the majority's result, but because those documents were work product prepared in anticipation of litigation, and not because they are covered by the attorney-client work privilege. Thus, I too vote to reverse.