

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-24-2006

# Pierce v. Blaine

Precedential or Non-Precedential: Precedential

Docket No. 04-9000

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Pierce v. Blaine" (2006). *2006 Decisions.* Paper 257.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/257

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 04-9000
_____

MICHAEL PIERCE

v.

CONNER BLAINE; THE DISTRICT ATTORNEY
OF PHILADELPHIA COUNTY; THE ATTORNEY
GENERAL OF THE STATE OF PENNSYLVANIA,

Appellants

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 02-cv-00513)
Senior District Judge: Hon. Ronald L. Buckwalter

_____

Submitted Under Third Circuit LAR 34.1(a)
September 1, 2006

Before: MCKEE, GREENBERG AND ROTH, <u>CIRCUIT</u> <u>JUDGES</u>

(Filed: October 24, 2006)

Thomas W. Dolgenos, Esq.
Office of the District Attorney
Three South Penn Square
Philadelphia, PA 19107
 Counsel for Connor Blaine, District Attorney of Philadelphia,
 Attorney General of Pennsylvania

Michael Wiseman, Esq.
James Moreno, Esq.
Defender Association of Philadelphia

Federal Capital Habeas Corpus Unit
The Curtis Center, Suite 545 West
Independence Square West
Philadelphia, PA 19106
    Counsel for Michael Pierce

_____

OPINION OF THE COURT

_____

PER CURIAM

Appellee Michael Pierce, a death-sentenced inmate incarcerated at the State Correctional Institution in Greene County, Pennsylvania ("SCI-Greene"), was convicted in 1990 following a jury trial of three counts of first degree murder, arson and other charges in connection with setting his parents' house on fire. Pierce's mother and 95 year-old grandmother died in the fire, and his father, who tried to save them, died six months later from complications due to smoke inhalation and bronchopneumonia. The fire was started in the basement by use of an accelerant, gasoline. Although an adult, Pierce was living with his parents just before the fire because his marriage had failed and he was unemployed. Pierce's sister, Joan, who escaped the fire, testified for the Commonwealth that Pierce believed that his parents were conspiring against him and trying to poison him.

Pierce's competence to stand trial and unyielding negative views about a psychiatric approach to his defense were issues from the beginning of the criminal proceedings. Our decision that we lack jurisdiction over this appeal requires that we

2

discuss this background in some detail. Prior to the appointment of Janice Smarro, Esquire, Pierce moved to have two prior lawyers discharged on the ground that each was conspiring with the District Attorney of Philadelphia. One of these attorneys, Michael Wallace, Esquire, sought a court-ordered competency evaluation. In November 1989, Dr. Eric Becker did a mental status examination and concluded that Pierce was competent to stand trial. Apparently, the trial court, the Honorable David N. Savitt, found Pierce competent to stand trial in December 1989. App. 64. Wallace tried to have the trial court order other evaluations in 1990, but Pierce refused to cooperate with Dr. Pietro Miazzo, App. 67, 69, and he then sought to have Wallace removed from his case.

Pierce went to trial with Smarro as counsel and was found guilty. At the penalty hearing, the Commonwealth argued two aggravating circumstances, murder in the course of committing another felony (arson) under 42 Pa. Cons. Stat. Ann. § 9711(d)(6), and creating a grave risk of death to a person other than the murder victims under subparagraph (d)(7) of the same statute. In her penalty-phase summation, Smarro raised four mitigating circumstances: that Pierce had no significant prior criminal history, 42 Pa. Cons. Stat. Ann. § 9711(e)(1), that he was under the influence of extreme mental or emotional disturbance at the time of the murders, subparagraph (e)(3), his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, subparagraph (e)(8), and any other mitigating factors under the catchall, subparagraph (e)(8). She implored the jury to consider that Pierce was

3

out of touch with reality and mentally ill at the time of the offense, but she did not seek to have Pierce evaluated by a mental health professional, nor did she seek a competency evaluation or an inpatient commitment. The jury returned sentences of death for each of the three murder convictions, after finding that the Commonwealth had proved both of the aggravating circumstances. Pierce was sentenced to death.

During post-verdict proceedings in 1991, Pierce's new attorney, Earl Kauffman, Esquire, argued that Smarro was ineffective at the penalty phase for failing to present psychiatric testimony, among other things. Pierce, however, again refused to speak to a psychiatrist, thus undermining new counsel's strategy for appeal. Following hearings, the trial court denied post-verdict motions, holding that Smarro was not ineffective. Psychiatric investigation would have been a futile gesture because of Pierce's refusal to present such evidence. Judge Savitt explained:

> With respect to the issue of psychiatric testimony, trial counsel testified at the July 10, 1991 [hearing] that defendant had told her "in no uncertain terms" that he would not speak to either a psychologist or a psychiatrist. In light of this, obtaining a psychiatric witness would have been a futile gesture. Furthermore, trial counsel did argue that the defendant was under the influence of extreme mental or emotional distress at the time he committed the act based on the testimony of Joan Pierce and Timothy O'Reilly and also that the defendant's capacity to conform his conduct to the requirements of law was substantially impaired also based on testimony at trial.

App. 58-59.

The state supreme court affirmed on July 1, 1994 in Commw. v. Pierce, 645 A.2d 189 (Pa. 1994). In pertinent part, the court held that trial counsel was not ineffective for

4

failing to introduce expert testimony on the issue of Pierce's mental state and the effects of his drug and alcohol abuse, stating that: "[A]n accused cannot refuse to cooperate with counsel in preparation of a particular trial strategy and then argue counsel's ineffectiveness for failing to pursue that course of action." Id. at 196 (citing Commw v. Szuchon, 484 A.2d 1365 (Pa. 1984)). The court explained:

> Appellant argues that trial counsel should have recognized that there was something critically wrong with [his] thought process and forced [him], against his own wishes, to present psychological evidence of emotional and mental disturbance in mitigation at the penalty phase. Trial counsel testified at the hearing on post-trial motions that she requested appellant submit to psychological and psychiatric interviews prior to trial and that appellant vehemently refused to cooperate. In fact at one of the hearings on post-trial motions (hearings were held on four separate dates) appellant testified that he had dismissed his first court appointed attorney over the issue of psychiatric evaluations. Appellant emphatically stated that there was nothing wrong with him and that he would not cooperate with preparation of psychological or psychiatric testimony.

Pierce, 645 A.2d at 196. No petition for certiorari was filed.

Pierce filed a state petition for post-conviction relief pro se in October 1994. Counsel was appointed and an amended petition was filed. The trial court permitted post-conviction counsel, Bernard Siegel, Esquire, to retain a psychologist, and Siegel attempted to have Pierce evaluated by Allan Tepper, Psy.D., to explore with him potential death penalty mitigation factors and issues, and the issue of his state of mind at the time of the offense. Pierce refused. The trial court convened a hearing on July 30, 1997, and Dr. Tepper was permitted to attend to speak with Pierce about his refusal to be examined. Pierce testified that he did not wish to pursue psychiatric defenses. He noted his high

5

intelligence and asserted that he had certain guilt-phase issues he wished to pursue, including some involving jury instructions. He believed that, with the death sentence in place, his eventual federal habeas appeal would receive greater attention. On the other hand, if the death sentence was vacated, he "could spend 20, 25, 30, 40 years trying to get my appeal heard," and, in any event, he was not afraid to die. App. 193-94, 211.

Dr. Tepper testified that, although Pierce appeared to have underlying psychiatric problems, he understood that he might be giving up a substantial right in not pursuing the mental illness mitigating issues. Moreover, he could listen to what others had to say and voice his opinion. App. 228-230. The state post-conviction petition was denied. Judge Savitt concluded that the issues had been previously litigated, and to the extent that new issues had been raised, Pierce voluntarily and knowingly did not wish to pursue any psychiatric defenses. App. 31-32.

Pierce filed a notice of appeal to the state supreme court and Siegel petitioned to withdraw as counsel. See Commw. v. Pierce, 786 A.2d 203, 211 (Pa. 2001). The request was granted and the trial court appointed Norris Gelman, Esquire, to handle the appeal. Gelman then moved for leave to withdraw as counsel and that request was granted. Id. The trial court then appointed Jules Epstein, Esquire, as Pierce's third post-conviction counsel, but Pierce moved to proceed pro se on his appeal. Id.

Pursuant to the state supreme court's directive, the trial court held a hearing on November 10, 1999, where both Pierce and Epstein were present. App. 536-58. At this

6

hearing, the trial court questioned Pierce to determine whether he knowingly wished to waive his right to counsel and proceed pro se, and the court concluded that he did. Pierce, 786 A.2d at 211-12. Pierce then proceeded pro se on appeal to the state supreme court, with standby counsel to assist him in complying with procedural rules. Id. at 212.

Pierce, when left to his own devices, raised no ineffective assistance of counsel issues concerning a failure to introduce psychiatric testimony in mitigation or on the issue of his mental state at the time of the offense. Instead, he raised a host of layered ineffective assistance of counsel claims that were not previously litigated, id. at 212-13, concerning jury instructions, identification and examination of witnesses, prosecutorial misconduct, pretrial identifications, the medical examiner's testimony, selection of jurors, and a trial exhibit, id. at 213-21, among others. The state supreme court heard these claims on the merits, and affirmed on December 21, 2001, id. at 223.

On January 31, 2002, Pierce filed a pro se petition for writ of habeas corpus under 28 U.S.C. § 2254 and a request for counsel. The District Court appointed the Defender Association of Philadelphia to represent him. About a month later, Pierce filed a motion for removal of court-appointed counsel, and a request either for new counsel or standby counsel, which the District Court denied. Within a week, Pierce again moved to have counsel removed, and again the District Court denied the motion.

On August 23, 2002, at the request of appointed counsel, Dr. Robert Fox, M.D., a psychiatrist, met with Pierce at SCI-Greene for 2½ hours. Dr. Fox introduced himself as

a medical doctor who had come to discuss Pierce's physical complaints and conduct a physical examination. App. 500. Pierce was satisfied with the introduction and agreed to cooperate. Dr. Fox began by asking Pierce to explain the nature of his physical ailments and concerns, and, without further prompting, Pierce described in detail bizarre scenarios concerning how correctional officers, by secretly drugging him, had damaged his body and changed his physical appearance.[1]

In addition to this lengthy in-person interview and opportunity to personally observe Pierce, Dr. Fox also reviewed extensive background materials. Despite not

[1] For example, Dr. Fox stated:

> [Pierce] believes that the guards have perfected a way to alter his appearance without leaving any physical trace that they had conducted these procedures. Included in the changes to his appearance that he described was the loss of his hair, and surgical changes to his nose and face. He also related that the guards had secretly cut his hair, that they had given him hair transplants, [and] performed plastic surgery on his hairline, nose, eyebrows, lips and chin. He described at length the way that the hair on his chest, forearm, legs and groin had been removed or gray hairs had been implanted.

> \*　　\*　　\*　　\*

> He also related an elaborate description of how he had been brainwashed while in prison.... He told me that he had undergone an electroencephalogram during which a "radio transmitter" or "transponder" had been implanted in his brain. Following this implantation he began to hear a voice speaking to him. He said the first time that he heard it the voice said, "Hi, Mike. I know telepathy like you. I'm a genius, too." He indicates that he has been hearing this voice continuously since 1992 when the "transmitter was implanted."

App. 501, 503.

8

performing a mental status examination, Dr. Fox was able to form an opinion. To a reasonable degree of medical certainty, he concluded that Pierce suffers from chronic paranoid schizophrenia, that his paranoid psychosis has existed since at least 1986 or 1987, and that he also has suffered from polysubstance dependence. Medical records from the Pennsylvania Department of Corrections, see Appellee's Brief, at 7-13, confirmed Pierce's paranoid psychosis and auditory hallucinations, he concluded. App. 506. Moreover, Pierce was suffering from the impact of these illnesses in 1989 at the time of his crime and was unable to appreciate the wrongfulness of his conduct, Dr. Fox concluded. App. 507. Finally, Dr. Fox expressed opinions that Pierce was not competent to stand trial, and, importantly for our purposes here, that he currently is unable to assist habeas counsel. He added that, if he had seen Pierce in a civil context, he would have opined that Pierce required a conservator or guardian to prosecute, protect or handle his affairs. Id.

Counsel filed an amended habeas petition in December 2002, and contended, among other claims, that Pierce was incompetent at the time of trial, trial counsel failed to investigate and litigate the issue of his incompetence, and he is currently incompetent. The petition contained only mental health claims that could be raised without Pierce's input, according to counsel, and not other potential claims that Pierce might want to raise, because counsel was unable to have a rational communication with him. See Appellee's

9

Jurisdictional Response, at 2.[2]

In February 2003, habeas counsel filed a petition for involuntary commitment to a forensic facility for an evaluation. Relying on Dr. Fox's examination, recent records reviews conducted by Robert Sadoff, M.D., Larry Rottenberg, M.D., and Dr. Tepper, and their own experiences in the preceding months trying, but failing, to circumvent Pierce's delusional thinking, counsel asserted that Pierce is not rationally able to assist in the habeas proceedings. Counsel argued that commitment of a capital defendant in a habeas proceeding was permissible under the Supreme Court's decision in Rees v. Peyton, 384 U.S. 312 (1966) (per curiam).

As we have explained, the petition for involuntary commitment made a reasonably strong showing that Pierce was acutely mentally ill in 2002 when Dr. Fox evaluated him. The District Court thus held a conference and invited the Commonwealth to identify a forensic psychiatrist to participate in an evaluation of Pierce's current competence to participate in his capital habeas litigation. Instead of identifying an expert to address Pierce's current mental state, the Commonwealth filed written opposition to the motion, contending that the state courts' 1989, 1997, and 1999 findings of competency were not stale, and that, even if Pierce is not currently competent to conduct this litigation, the District Court should explore the possibility of appointing a "next friend," Whitmore v.

---

[2] A claim that Pierce is not competent to be executed was raised in the counseled habeas petition but is not yet ripe because execution is not imminent and no death warrant has issued. See generally Mata v. Johnson, 210 F.3d 324, 330 (5th Cir. 2000).

Arkansas, 495 U.S. 149 (1990), to assess what Pierce wants to do.

In October 2003, the District Court granted the motion for a commitment to a secure psychiatric facility for a long-term evaluation to determine Pierce's current competence to rationally assist habeas counsel and to determine whether he suffers from paranoid schizophrenia or any other mental illness. The order did not identify a particular facility nor did it determine the length of the commitment. The court expressed the belief that appointment of a next friend would not be helpful because the question was whether Pierce's incompetence rendered him unable to assist counsel, and he did not want to be evaluated voluntarily to answer that question.

The Commonwealth moved for reconsideration, or, in the alternative, for permission to appeal under 28 U.S.C. § 1292(b), arguing that transfer to a psychiatric facility for a "forced" evaluation triggers certain due process rights which have not been afforded to Pierce, and that habeas counsel is forcing a litigation strategy on him that he does not want. The Commonwealth further suggested that "conflict" counsel be appointed.

The District Court denied the motion for reconsideration in December 2003 and would not certify the issue for appeal under section 1292(b). The court stated that "it seems to me that reasonable people would agree that based upon the record in this case, the petitioner needs the evaluation ordered by this court...." The District Court indicated the need for a status conference before execution of the commitment order, but the

11

Commonwealth filed a notice of appeal. Following the appeal, the District Court stayed implementation of its commitment order.

Our Clerk sent a letter to counsel noting the apparent absence of jurisdiction over what appeared to be an interlocutory order and invited responses. Both parties filed a response. We then deferred decision on the jurisdictional question and ordered briefing on the merits. The parties have filed briefs, which incorporate their previous jurisdictional responses, all of which we have carefully reviewed. The Commonwealth has asked us to find jurisdiction under the collateral order doctrine, Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541 (1949); Coopers & Lybrand v. Livesay, 437 U.S. 463 (1978), a request we decline.

We will dismiss the appeal for lack of jurisdiction. Only final decisions of a district court are appealable. 28 U.S.C. § 1291. An order committing a state capital habeas petitioner for psychiatric evaluation is not a final order on the merits of his habeas petition. Section 1291 provides a basis for jurisdiction here only if the commitment order falls within a narrow class of "collateral" orders that may be reviewed. Under the collateral order doctrine, we may review an order if it (1) finally resolves a disputed question; (2) resolves an important question completely separate from the merits of the case; and (3) is effectively unreviewable or inadequately vindicable on appeal from a final judgment. Coopers & Lybrand, 437 U.S. at 468. See also In re: Ford Motor Co., 110 F.3d 954, 958 (3d Cir. 1997).

12

The Cohen requirements are a matter of an appellate court's subject matter jurisdiction, and thus we must assess the question without regard to whether the parties believe that jurisdiction exists. Digital Equipment Corp. v. Desktop Direct Inc., 511 U.S. 863, 869 n.3 (1994). Historically, the Supreme Court has applied the collateral order doctrine in criminal cases only in narrow circumstances. See Flanagan v. United States, 465 U.S. 259, 265 (1984). See also United States v. Williams, 413 F.3d 347, 354-55 (3d Cir. 2005) (rule of finality has special force in criminal prosecutions). Strictly speaking, habeas is a civil, not criminal, proceeding, but the Supreme Court's decisions in Digital Equipment Corp., 511 U.S. at 868, and Will v. Hallock, 126 S. Ct. 952 (U.S. 2006), make it clear that the collateral order doctrine is a narrow exception that "should stay that way," even in civil cases. Id. at 958. Importantly, the final judgment rule promotes efficient judicial administration by emphasizing the deference an appellate court owes to the district court's decisions on the many questions of law and fact that arise before judgment. Richardson-Merrell, Inc. v. Koller, 472 U.S. 424, 430 (1985).

We conclude that the balance in this case tips in favor of rigorous application of the final judgment rule. Our decision that the collateral order doctrine does not apply here rests on the second Cohen prong, concerning whether the order (a) resolves an important question (b) completely separate from the merits, and to some extent on the third prong. If any one prong is not satisfied, jurisdiction is defeated. Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 276 (1988). We will assume for the

13

sake of argument that the first <u>Cohen</u> prong is satisfied, that is, that the commitment for evaluation order finally resolves a disputed question.

The Commonwealth contends that a line of cases finding pretrial involuntary commitment orders appealable under the collateral order doctrine, <u>United States v. Deters</u>, 143 F.3d 577 (10th Cir. 1998); <u>United States v. Rinaldi</u>, 351 F.3d 285 (7th Cir. 2003); <u>United States v. Davis</u>, 93 F.3d 1286 (6th Cir. 1996); and <u>United States v. Weissberger</u>, 951 F.2d 392 (D.C. Cir. 1991), apply here, because the commitment is involuntary and the question of involuntary commitment satisfies the <u>Cohen</u> "importance" prong under <u>Sell v. United States</u>, 539 U.S. 166 (2003). Moreover, there is no effective relief for involuntary confinement once it has taken place. <u>See</u> Appellant's Jurisdictional Response, at 2-3.

The Commonwealth further asserts that Pierce's habeas attorneys are trying to commit him against his will, that he does not want to be moved to a psychiatric facility, and "there may be stigma attached with such a transfer; or, a person who believes himself sane may feel dehumanized and demeaned by commitment." <u>Id.</u> at 4. It asserts that "someone who does not want to pursue mental health issues in his habeas litigation (which is clearly the position Pierce took in state court) may feel that commitment is the first step toward forcing him to accept a legal strategy that he does not want." <u>Id.</u> The Commonwealth goes on to say that it takes "little imagination" to grasp that Pierce's habeas counsel "hope to create a basis for arguing that he was incompetent to stand trial,

14

or that more mental health evidence should have been presented to the trial court, or during the sentencing hearing." Id. at 6. Furthermore, it has a strong interest in defending the conviction and the court's order requires release from state custody.

In its merits brief, the Commonwealth has complained that habeas counsel obtained an ex parte order from the District Court, prior to filing the involuntary commitment petition, which authorized an MRI and PET scan of Pierce at the University of Pittsburgh Medical Center that was only vacated when the Commonwealth discovered the order and protested. See Appellant's Brief, at 13.

We are not persuaded by these arguments to extend the collateral order doctrine here. First, we do not agree that the issue is completely separate from the merits of the case. Coopers & Lybrand, 437 U.S. at 468. As Pierce's merits brief plainly evidences, his competence will be a primary basis for his habeas petition. See, e.g., Appellee's Brief at 14 ("The state court record (both trial and post-conviction) reveals significant indicia of Mr. Pierce's mental illness."), 16 ("Mr. Pierce's paranoia and impaired mental health dominated his relationships with the attorneys who tried to represent him in state court."). Thus, we cannot address the competency-related issues raised in this appeal without touching on an issue central to the merits of the habeas petition. See Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1117 (3d Cir. 1986); New York v. U.S. Metals Refining Co., 771 F.2d 796, 799-800 (3d Cir. 1985).

Second, the Commonwealth's cases do not support application of the collateral

15

order doctrine. In <u>Deters</u>, 143 F.3d 577, the defendant's lawyer asked for a pretrial competency evaluation under 18 U.S.C. § 4241 and § 4242, and the defendant asked to be examined on an outpatient basis. The court ordered an inpatient commitment, and the defendant appealed on the ground that the commitment order deprived her of liberty without due process. The Tenth Circuit held that the order was appealable under the collateral order doctrine, reasoning that a deprivation of liberty for 45 days was important. <u>Deters</u>, 143 F.3d at 580.

In <u>Weissberger</u>, 951 F.2d 392, the District of Columbia Circuit held that an appeal from a competency evaluation order was akin to an appeal from the denial of bail, and, as is the case with denial of bail, post-confinement review provides no relief for the loss of liberty associated with the competency evaluation. <u>Id.</u> at 396 (citing <u>Stack v. Boyle</u>, 342 U.S. 1, 6 (1951)). The court explained: "As in the case of pretrial detention, an appellant cannot be left without recourse to appellate review in a situation where he faces an immediate and significant loss of personal liberty." <u>Weissberger</u>, 951 F.2d at 397 (footnote omitted).

In <u>Rinaldi</u>, 351 F.3d 285, the district court ordered the defendant to be committed for 45 days. The defendant, who was not in custody at the time, appealed, and the Seventh Circuit assumed jurisdiction under the collateral order doctrine. Applying <u>Stack</u>, the court reasoned that, when an order calls for a defendant's incarceration, appellate review is proper. <u>Id.</u> at 288. The Sixth Circuit's decision in <u>Davis</u>, 93 F.3d 1286, which

16

involved similar facts, is in accord, id. at 1289. See also United States v. Friedman, 366 F.3d 975, 979-80 (9th Cir. 2004) (accord).

Thus, Deters, Weissberger, Rinaldi, and Davis all involved individuals who were not in custody at the time of the commitment orders. The courts' analysis of the issue whether the commitment order was important and effectively unreviewable on appeal from a final judgment turned on a loss of liberty. There is nothing "important," as that term is understood under Cohen, about the issue raised by this appeal as Pierce is in custody as a death row inmate. The cases cited by the Commonwealth are not persuasive in the context of this case, because Pierce will be in custody in one place or another. Importance has a particular meaning under Cohen. See Ford Motor Co., 110 F.3d at 959. "It does not only refer to general jurisprudential importance. Rather," an issue "is important if the interests that would potentially go unprotected without immediate appellate review are significant relative to efficiency interests sought to be advanced by adherence to the final judgment rule." Id.

Similarly, whether a right is 'adequately vindicable' or 'effectively unreviewable' under the third Cohen prong is answered by a judgment about the value of the interests that would be lost through rigorous application of the final judgment requirement. Digital Equipment, 511 U.S. at 878-79. In Vitek v. Jones, 445 U.S. 480 (1980), the Supreme Court held that transfer of a prisoner to a mental hospital triggers certain due process protections that perhaps were not afforded here, but Vitek is not particularly instructive

17

because it is not a collateral order doctrine case; it does not address the question of "importance" relative to the interests sought to be advanced by adherence to the final judgment rule. In any event, Vitek involved an open-ended civil commitment and involuntary treatment unrelated to any ongoing court proceedings rather than an inpatient evaluation for the limited purpose of determining competence to assist counsel.

As noted by the Commonwealth, the Supreme Court recently approved application of the collateral order doctrine to an order forcing medication on a defendant in Sell, 539 U.S. 166. The Court reasoned that the legal right to avoid forced medication "raises questions of clear constitutional importance" and "is completely separate from the merits of the action, *i.e.*, whether Sell is guilty or innocent of the crimes charged" and "wholly separate as well from questions concerning trial procedures." Id. at 176. With respect to the third Cohen prong, the Court reasoned that an acquittal would not undo the harm of forced medication. Id. at 176-77.

The cases relied on by the Court, id., to establish "importance" under Cohen were Winston v. Lee, 470 U.S. 753, 759 (1985), involving a serious surgical intrusion into an individual's body to obtain evidence that the state had failed to demonstrate a compelling need for, Riggins v. Nevada, 504 U.S. 127, 133-34 (1992), involving forcing a heavy dose of antipsychotic medication on a defendant during trial, Cruzan v. Director, Mo. Dept. of Health, 497 U.S. 261, 278-279 (1990), involving the artificial feeding and hydration of an individual in a persistent vegetative state, and Washington v. Harper, 494

18

U.S. 210, 221-222 (1990), involving, in a civil rights action, whether due process requires a judicial hearing before a state may treat a non-consenting convicted prisoner with antipsychotic medication.

We do not interpret Sell to require application of the collateral order doctrine here, because we are not faced with the more severe intrusion of forcing antipsychotic medication on an unwilling defendant who is not a danger to himself or others. Nor are we faced with any other sort of forced physical intrusion of the kind noted in Winston, Riggins, Cruzan, or Harper. Instead, Pierce will be transferred for observation and evaluation. He may voluntarily agree to be interviewed, as he did with Dr. Fox with only minimal prompting, or he may even agree to some form of therapeutic intervention, but if he refuses to participate, then all that will happen to him is that he will be housed in a custodial setting and observed, just as he is now.[3]

In the wake of Sell, courts have applied the collateral order doctrine to involuntary medication orders, see, e.g., United States v. White, 431 F.3d 431, 432-33 (5th Cir. 2005); United States v. Morrison, 415 F.3d 1180, 1184 (10th Cir. 2005); United States v. Bradley, 417 F.3d 1107, 1109 & n.1 (10th Cir. 2005), but the parties have not called our attention to any decisions applying the collateral order doctrine to commitment orders that do not involve an actual loss of liberty, cf. Stack, 342 U.S. at 6, or a severe intrusion like

_____

[3] Initially, Pierce agreed to undergo neuroimaging at the University of Pittsburgh Medical Center because of his desire to find the transponder he believes was implanted in his brain. After the District Court ordered the testing, Pierce refused to cooperate, and that was the end of the matter. See Appellee's Brief, at 23 n.23.

19

involuntary medication.  Cf. United States v. Weston, 194 F.3d 145, 148-49 (D.C. Cir. 1999) (leaving open whether Weissberger, 951 F.2d 392, extends to psychiatric examination that does not involve actual loss of liberty).

In Bacher v. Allstate Ins. Co., 211 F.3d 52 (3d Cir. 2000), we were asked to extend our holdings that the requirements of the collateral order doctrine are satisfied when a party appeals a discovery order involving privileged information or a trade secret, see Montgomery County v. Microvote Corp., 175 F.3d 296, 300 (3d Cir. 1999) (attorney-client and work product privileges); Ford, 110 F.3d at 957-64 (same); Smith v. BIC Corp., 869 F.2d 194, 198-99 (3d Cir. 1989) (trade secrets), to disclosure of sensitive information, and we declined to do so.  We drew the line in Bacher, because we were concerned that the "sheer number of discovery rulings and the myriad procedural requirements governing them" would "provide fertile soil for the growth of appealable orders" that "would only disrupt and delay district court proceedings and clog the courts of appeals with matters more properly managed by trial courts familiar with the parties and their controversy."  Bacher, 211 F.3d at 54-55.

Those same concerns inform our decision here.  Extending the collateral order doctrine to all involuntary commitment orders, see Digital Equipment, 511 U.S. at 868 (collateral order doctrine should apply to broad categories of orders without concern for individual circumstances of particular cases), would be a dramatic extension of the doctrine, the need for which has not been demonstrated here.  We recognize that "the

20

strong bias of § 1291 against piecemeal appeals almost never operates without some cost" and "almost every pretrial or trial order might be called 'effectively unreviewable' in the sense that relief from error can never extend to rewriting history." Digital Equipment, 511 U.S. at 872. However, there is no traditionally recognized basis for assuming jurisdiction under the collateral order doctrine in this context, and thus we must resist the temptation to extend either Sell or Deters, Weissberger, Rinaldi, and Davis any further.

Furthermore, we simply cannot ignore the fact that Pierce himself has not appealed. As the parties have amply demonstrated, he has a history of making arguments on his own behalf. Throughout the years of his incarceration, he has filed numerous frivolous civil rights lawsuits, complaining about poisoning, bodily intrusions, tamperings with his hair, and unauthorized plastic surgeries, see Appellee's Brief, at 5-7, and, of course, he made his feelings known repeatedly during his criminal case that he did not wish to pursue psychiatric defenses.[4] In this, his capital habeas litigation, he abandoned any efforts to have counsel removed early in the litigation. After initially asking the District Court for new or standby counsel twice in the spring of 2002, there were, and have been, no further attempts by Pierce to have counsel removed.[5] Accordingly, if the

_____

[4] We are merely making an observation about the record. We express no view whatever on whether Pierce's waivers were competent or informed, as those issues go to the heart of the merits of his habeas petition.

[5] Pierce corresponded with us once. Early in this appeal our Clerk received a letter from him that was illegible. It was returned to him by court staff with a request that he print clearly or type, and the Court has not heard from him since.

21

important right to be vindicated by an immediate appeal is indeed Pierce's right to avoid the stigma of a psychiatric commitment, *he* certainly is not making that argument.[6]

The Commonwealth's other arguments in favor of our assuming jurisdiction are equally unavailing. In its merits brief on appeal the Commonwealth takes aim at Dr. Fox's 2002 evaluation, arguing that there was "plenty of room for cross-examination," and that the opinion was not enough to justify an involuntary commitment. For example, Dr. Fox "does not say whether Pierce has *episodes* of schizophrenia or delusions, followed by periods of remission; he does not say whether Pierce has delusions about some things, but not others – all of which would impact Pierce's competence at a particular time, or on a particular topic." See Appellant's Brief, at 39-40. These may be valid points, but the Commonwealth was given an opportunity by the District Court to identify an expert to rebut Dr. Fox's assertions concerning Pierce's current mental state and it declined the offer. The Commonwealth cannot refuse to participate in the proceedings below and then expect the court of appeals to intervene. Cf. Cohen, 337 U.S. at 546 ("Appeal gives the upper court a power of review, not one of intervention").

With respect to forcing a litigation strategy on Pierce, any question of competence

_____

[6] We also question both habeas counsel's and the Commonwealth's assertion that Pierce is opposed to *any* form of evaluation or treatment. Dr. Fox noted in his affidavit that, although Pierce has consistently refused to be psychiatrically evaluated for any purpose related to guilt phase defenses or for the presentation of mitigating evidence, he has not refused mental health evaluations by correctional or court staff. App. 498. The Department of Corrections progress notes further indicate that Pierce also has taken low doses of antipsychotic medication, although not recently.

to waive claims is premature.  See Rohan ex rel. v. Woodford, 334 F.3d 803, 816 (9th Cir. 2003).  If Pierce is found to be competent after the evaluation, then habeas counsel will be appropriately guided in regard to presenting "his claims" to the District Court.  The Commonwealth is concerned that Pierce's lawyers, in having him committed, will have a further opportunity to create a basis for arguing that he was incompetent to stand trial, or that more mental health evidence should have been presented to the trial court or during the sentencing hearing, see Appellant's Jurisdictional Response, at 6, but it is the District Court's responsibility to adequately "police the prejudgment tactics" of habeas counsel, if that is, in fact, required.  Richardson-Merrell, 472 U.S. at 436.  Furthermore, the Court's order does not release Pierce from state custody – it is a temporary measure to accomplish a specific and finite goal, that is, *evaluation*, within the confines of a custodial setting, and it is not clearly beyond the discretion of the District Court in aid of its jurisdiction, Rees, 384 U.S. at 314;[7] cf. 18 U.S.C. §§ 4241(a), 4247(b) (West 2000) (authorizing

---

[7] In Rees, counsel filed a petition for writ of certiorari, but the petitioner then directed him to withdraw it.  Counsel advised the Supreme Court that he could not in good conscience withdraw the petition.  He then had the petitioner examined by a psychiatrist who concluded that the petitioner was mentally incompetent.  The Supreme Court, "in aid of the proper exercise of its certiorari jurisdiction," id. at 313, directed the district court to determine the petitioner's capacity to make a rational choice with respect to continuing or abandoning further litigation, and to subject him, if necessary, to temporary federal hospitalization.  The Court explained that "Whether or not Rees shall be allowed in these circumstances to withdraw his certiorari petition is a question which it is ultimately the responsibility of this Court to determine, in the resolution of which Rees' mental competence is of prime importance."  Id. at 313.  The Court looked to 18 U.S.C. §§ 4244-4245, involving commitment of convicted federal prisoners, for analogous support for temporary hospitalization of a state habeas petitioner.  Id. at 314.

23

temporary commitment of federal prisoner upon reasonable cause to believe he may presently be suffering from mental disease or defect rendering him mentally incompetent to extent that he is unable to understand nature and consequences of proceedings against him or to assist properly in his defense").[8]

We will dismiss the appeal for lack of jurisdiction.

---

[8] The state Mental Health Procedures Act, 50 Pa. Cons. Stat. Ann. § 7101 et seq. (West 2001), is not applicable in this context.